**TOKYO SHIBAURA ELECTRIC CO., LTD., et al., Plaintiffs,**

v.

**ZENITH RADIO CORPORATION, Defendant.**

**Civ. A. No. 4672.**

United States District Court,
D. Delaware.
Nov. 7, 1975.

James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Edward F. McKie, Jr., Dale H. Hoscheit, and James A. Sheridan, of Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., for plaintiffs.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., Dugald S. McDougall, of McDougall, Hersh & Scott, Chicago, Ill., for defendant.

## OPINION

STAPLETON, District Judge:

### I. PARTIES AND JURISDICTION

This is a declaratory judgment action which poses questions regarding the validity, infringement and enforceability of a patent on certain improvements in color television picture tubes. Plaintiffs, Tokyo Shibaura Electric Co., Ltd., Toshiba America, Inc., and Toshiba Hawaii, Inc., (hereinafter collectively referred to as "Toshiba") are respectively, a Japanese corporation and its wholly-owned New York and Hawaiian subsidiaries which sell color television picture tubes in the United States. Defendant, Zenith Radio Corporation ("Zenith") is a Delaware corporation whose principal place of business is neither New York nor Hawaii; venue is properly laid in this district under 28 U.S.C. § 1391(c). Toshiba seeks a judgment declaring the invalidity, non-infringement and unenforceability of Zenith's United States Letters Patent No. 3,146,368 (the " '368 patent"), issued August 25, 1964 to J. P. Fiore and S. H. Kaplan. Zenith, as

their assignee, has counterclaimed for infringement of the '368 patent by Toshiba. These issues have been tried,[1] and I find that there exists a substantial and actual controversy between the parties on the issues presented in this action, justifying a declaratory determination of their respective rights.

## II. BACKGROUND FACTS

The story of color television picture tube design begins almost half a century ago (see DX 21, p. 1177), but it is sufficient for present purposes to refer only to the period commencing in 1953, when the Federal Communications Commission determined that television pictures transmitted in color had to be "compatible" with—that is, able to be received on —conventional black and white television receivers.[2] Several different kinds of television picture tubes were proposed for use in the new "compatible" system and competed for favor in industry laboratories for some years. Although only one type ultimately entered commercial production, three types play a role in the present action and a description of the structure and operation of each is necessary.

### A. *Common Features Of Relevant Tubes*

In all three types of tubes, the color picture seen by the viewer is created in the same basic manner. On the inside surface of the viewing screen[3] of the picture tube are deposited a very large number of "phosphors"—chemical materials which have the property of emitting visible light when bombarded by electrons (Tr. 47). Different phosphors will emit light of different colors, and by placing phosphors which emit the three "primary" colors of red, blue and green in close conjunction with each other on the viewing screen, any visible color can be reproduced by bombarding a suitable combination of these phosphors (Tr. 61; DX 21, p. 1178). For convenience, these phosphors will hereinafter be called red, blue and green, even though they are in reality whitish except when being bombarded (Tr. 62, 448). The emitted colors can be made brighter or dimmer by varying the intensity of the bombardment (Tr. 46, 50).

This bombardment is accomplished by means of one or more "beams" of electrons generated by one or more "electron guns" which are mounted in the neck of the tube and which project the beams onto the viewing screen (Tr. 46–47). These beams bombard only a small portion of the screen at any one instant, but the different phosphors are so small and so close together, and the beam "scans" the viewing screen at so rapid a pace, that the human eye can perceive only a single color picture (Tr. 46–51).

The electrons striking the glass viewing screen have a tendency to remain there. Their accumulation can cause the screen to repel the similarly charged electrons aimed at it on the beam's next scan (Tr. 52), and for this reason a thin layer of aluminum is ordinarily placed on top of the phosphors on the inside surface of the viewing screen (see Fig. 3, *infra*). This layer not only conducts the electrons away from the screen after they have bombarded the phosphors but also increases the efficiency of the phosphors by reflecting out to the viewer the light initially emitted by the phosphors towards the inside of the tube (Tr. 52–53, 457).

---

1. The issue of damages on the counterclaim has been severed for separate trial (if necessary).

2. For a general discussion of the developments leading up to this action, see *Columbia Broadcasting System v. Sylvania Electric Products, Inc.*, 294 F.Supp. 468 (D.Mass. 1968), *aff'd in part and remanded in part*, 415 F.2d 719 (1st Cir. 1969), *cert. denied*, 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970).

3. In the record the viewing screen is frequently referred to as the "faceplate".

### B.  *The Shadow Mask Tube*[4]

It is essential for any color picture tube to have means for assuring that the electron beam bombards the proper phosphor at the proper time and with the proper intensity—otherwise the resulting picture will not be the picture intended. The shadow mask tube, which is the type of tube used in every commercially available color television set today (DX 20, p. 2), accomplishes this essential function of color selection by utilizing three electron guns and a "shadow mask" from which it takes its name.

A shadow mask is a thin metal membrane which is placed inside the tube, immediately behind and parallel to the screen, as shown in this cross-sectional view:[5]

Figure 1.  Basic design of shadow mask tubes.

---

The mask is perforated with a very large number (a third of a million would be a typical number—DX 20, p. 42) of small apertures,[6] each aperture positioned directly behind the center of a set or "triad" of three adjacent phosphor dots or stripes, one of each primary color.

In the shadow mask tube, the electron beams that bombard the phosphors come from a cluster of three electron guns, with each gun emitting the electrons intended to strike only the phosphors of a given color (DX 20, pp. 42–43). The geometrical relationship of the guns, the mask and the screen is designed such

4. The "PDF" tube, described below, is technically a variety of shadow mask tube. For convenience, however, the words shadow mask tube will be used in this opinion to refer only to a tube of the type described in the accompanying text.

5. This and the following diagrams are intended to illustrate the concepts discussed in this opinion. None of them is drawn to scale, and many omit unnecessary details.

6. For this reason, it is sometimes called an "aperture mask". The apertures are sometimes also referred to as "holes".

that the beams from the three guns converge at the mask, with each beam at a different angle. The result is that only so much of each beam as will strike the correct phosphor is able to pass through the mask:

Figure 2. Operating principle of shadow mask tube.

(see Tr. 63–69; DX 20, pp. 12–14; PX 116 generally). It is in this manner that the color selection is achieved in a shadow mask tube.

Figure 2 is especially exaggerated in showing the shadow mask midway between the electron guns and the viewing screen. In reality, the mask is mounted immediately behind the screen (see PX 172), so that for practical purposes the size of the aperture in the shadow mask and the size of the electron beam landing area will be the same (Tr. 200, 598).

### C. The Post-Deflection Focusing Tube

One disadvantage of the simple shadow mask tube, as can be seen in Figure 2, is that the mask intercepts the bulk of the electrons generated by the electron guns, thus considerably reducing the brightness of the picture which can be generated by a gun of a given efficiency (see Tr. 72–74). The post-deflection focusing, or "PDF", tube is a shadow-mask tube with a particular additional feature intended to mitigate this problem. The apertures in the mask are enlarged, permitting more electrons to pass through. Without more, this would defeat the color selection function of the mask. However, by operating the viewing screen at a higher voltage or potential than the shadow mask, the electron beams passing through the apertures

can be focused down to acceptable size (see Tr. 197–199; 454–55; DX 20, pp. 14, 135). This type of tube, while offering an easily-achieved improvement in brightness, has a number of practical disadvantages not encountered in simple shadow mask tubes and has never entered commercial production (Tr. 116–17, 161, 196–97; DX 20, pp. 14, 154).

### D. The Index Tube

In index tubes, the phosphors are deposited on the viewing screen in stripes. Only one electron gun is used; its single beam sweeps across the screen, bombarding the phosphors of each color in turn. There is no shadow mask; the electron beam has direct, unimpeded access to the screen. Color selection must thus be accomplished by precise synchronization of the position and modulation of this beam, so that, for example, it bombards only the red phosphors during those moments when it is transmitting red picture information (Tr. 1013–19; DX 20, pp. 15–16, 155–172). The practical problem involved in achieving this sort of control with the required precision has never been overcome with sufficient success to make commercial use practicable (Tr. 488).

### III. PROBLEMS IN EARLY COLOR TELEVISION TUBES

Shadow mask color picture tubes of the sort described above were built in the laboratory as early as 1950, and were in commercial production by 1954 (DX 39, pp. 4–6). However, these early or "conventional" tubes did not project as good a picture as contemporaneous black and white television tubes. The reason lay in the interrelated problems of achieving "color purity", "white uniformity", "brightness" and "contrast".

Color purity and white uniformity are two sides of the same coin, the coin being proper registration of the electron beams with the proper phosphor areas on the screen. Ideally, the landing area of, for example, the red beam would be exactly coincidental with the red phosphor. If, however, the red beam is not in such perfect registration and impinges on a portion of a neighboring blue phosphor, the viewer will see blue where he was meant to see red (or, if the primary colors are being combined to produce an intermediate tint, the proper tint will not be seen). This is known as a loss of color purity and the misregistration causing it is called "clipping" because the electron beam "clips" a portion of the wrong phosphor.[7] A loss of white uniformity, on the other hand, occurs when less than all of the electron beam reaching the screen falls within the confines of the proper phosphor. This latter phenomenon is known as "leaving" since the beam or a portion thereof moves off its proper phosphor.[8] This may cause a variety of problems.[9] It should be noted that in tubes where the phosphors are tangent to one another—as they were in early shadow mask tubes—losses of color purity and white uniformity—i.e., "clipping" and "leaving" occur simultaneously.

Brightness and contrast are terms familiar to every television viewer. Brightness has to do with the total amount of luminance projected by the tube to the viewer (see DX 20, p. 6); it is a function, in the first instance, of the strength of the electron beams bombarding the phosphors of the screen (Tr. 46). Contrast is measured by the ratio between the highest and lowest luminance levels in a picture; a picture with a low contrast ratio appears "washed out" (Tr. 54–5). Contrast is affected significantly by various unwanted sources of light, such as room light, as will be discussed below (Tr. 75).

The major difficulty involved in the manufacture of a shadow mask tube which is not present in black and white tube technology is the extreme accuracy

---

7. See DX 20 at 120.

8. *Id.*

9. See Tr. 114–15; 180–81; 497; 814.

demanded in the fabrication and relative positioning of the viewing screen and the mask. Because the mask apertures and the phosphor dots are so tiny and so close together (Tr. 70, 87–8, 275), even the slightest misalignment in these two parts will cause misregistration of the electron beams, resulting in a loss of color purity and white uniformity (see Tr. 70–71). It is, however, impossible to achieve such perfection in a mass production context (Tr. 71, 77). The practical solution is, instead, to make allowances in the design of the tube for a certain amount of leeway, or "tolerance", for error. In all commercial tubes made prior to the '368 patent, this was done by making the apertures in the shadow mask slightly smaller than the phosphor dots on the screen. This in turn made the beam landing areas on the screen smaller than the phosphor dots they were supposed to hit (Tr. 71–78). The net result was a "guardband" surrounding the beam landing area within the phosphor which guardband simultaneously provided both "clipping" and "leaving" tolerance, the amount of the tolerance in each case being the width of the guardband. With this dual tolerance, illustrated in Figure 3,[10] no harm would occur if a beam "wandered" slightly because of misalignment of the mask and screen.[11] As can be seen, only if the beam is misplaced by a distance greater than the width of the "guardband" surrounding it, will it leave its proper phosphor or impinge upon another.

phosphor dots

electron beam landing areas

"guardband"

Figure 3. Positive tolerance screen geometry.

10. Figure 3 is equivalent to Figure 3 of the '368 patent, defined as "a schematic view, showing the arrangement of a triad of phosphor areas relative to the areas of impingement of the electron beams from the aperture mask in prior art color tubes." Col. 2, lines 52–55.

11. Or for other reasons, such as expansion caused by heating, the influence of outside magnetic fields, etc. See, e. g., PX 131, Col. 1, lines 21–30; DX 20, p. 66.

This system, which is now known as "positive tolerance" (Tr. 157), while successful in reducing the likelihood of color purity and white uniformity errors, did not produce a color picture with the brightness and contrast of tubes available on today's market. The shadow mask, with its small apertures, allowed only 20% or fewer of the electrons generated by the electron guns to reach the screen (DX 20, p. 135; Tr. 74). Given the limitations on electron gun technology, this significantly affected brightness. Contrast was also adversely affected by the fact that the phosphors not being bombarded at any given moment were effective reflectors of room light (Tr. 75, 197; DX 20, pp. 6, 112, 117–23). Since the phosphor dots on conventional color picture tube screens were tangent to each other, as illustrated in Figure 3, the screen was virtually fully covered with phosphors, and a large amount of room light was reflected back at the viewer. This caused the dim parts of the picture to seem brighter, but reduced the contrast ratio to unacceptable levels. Contrast could be improved by making the viewing screen out of gray, light-absorbing glass, as opposed to clear glass. This improved contrast because the light emanating from the screen to the viewer only had to pass through the gray glass once, while the room light had to pass through it twice—once on the way into the phosphor, and again on the way back. Thus the room light was attenuated twice as much as the light from the picture (DX 20, p. 6; Tr. 74–6). Gray glass was used to bring contrast up to acceptable levels in conventional tubes, but this had the unfortunate side-effect of further reducing picture brightness by as much as fifty to sixty percent (DX 20, pp. 112, 118).

These interrelated problems were apparent to everyone in the industry, and various research groups attempted to find ways in which to achieve a better overall blend of color purity, white uniformity, brightness and contrast.

## IV. THE SOLUTION OF THE '368 PATENT

■ The patent in suit teaches that the problems just discussed can be alleviated by constructing the tube it discloses and claims. Claim 1 of the '368 patent [12] describes a tube which conforms in general to the conventional shadow mask tube described above. But the tube described in Claim 1 differs in

12. Claim 1 reads:

A color reproducing cathode-ray tube comprising within an evacuated envelope: a multi-color image screen including a plurality of interspersed groups of elemental phosphor areas, each of said elemental phosphor areas being spaced from all adjacent such areas by intermediate light absorbing areas; electron gun means for projecting a corresponding plurality of electron beam components towards said image screen; and means including a color-selection electrode, provided with a plurality of apertures individually larger than said elemental phosphor areas and disposed between said screen and said electron gun means for selectively directing said electron beam components onto areas of respective ones of said groups.

Claim 2 recites a tube as in Claim 1 with a transparent faceplate, which was conventional in the art. Claim 3 recites such a tube with a faceplate of clear glass, which was a matter of designer's choice, and had been previously taught. See PX 120, Admission 13; Tr. 140, 266. Claim 4 recites circular phosphor areas and mask apertures, which was conventional. Claim 5 recites that the light absorbing material is "a coating", in line with the method of manufacture taught by the patent. Claim 6 specifies that the coating is a "black pigment material." Claim 9 is a combination summary of prior claims. All these claims embody only one invention, the negative tolerance design, and all must stand or fall together in this case. Claims 7 and 8 add to Claim 1 the additional feature of compensation for unequal phosphor efficiency by making the sizes of the phosphor areas inversely proportional to their light-projection efficiencies. This teaching has not been commercially practiced by Toshiba, and Zenith makes no charge that these claims are infringed (Tr. 562–63). I, accordingly, find that there is no actual controversy between the parties as to these claims, and that they are, therefore, not in suit here.

a number of ways. The claim calls for each phosphor area to be "spaced from all adjacent such areas by intermediate light absorbing areas" and for the shadow mask to be perforated by apertures which are "individually larger than" the phosphor dots (DX 1, Col. 6, lines 56–68). Figure 4 of the specifications of the '368 patent illustrates the interior of the viewing screen of the claimed invention in the following manner: [13]

Figure 4. Negative tolerance screen geometry of '368 patent.

The picture presented by such a tube has better contrast than that of a conventional tube, since, as the patent's specifications point out, the reduced amount of the screen covered by phosphors, combined with the black, light absorbing material which occupies the rest of the screen, makes it much less reflective of room light (Col. 1, lines 63–66; Col. 4, lines 32–53). Claim 3 then teaches that a clear glass viewing screen can be used with such a tube (Col. 6, lines 72–73). This will tend to reduce the improvement in contrast, but will yield substantially better brightness (Col. 4, lines 32–46) (Tr. 87).

As previously noted, a certain tolerance for manufacturing imperfections is essential in the design of a commercially feasible tube. In conventional tubes, this had been provided by making the electron beam landing areas smaller than the phosphor dots by a sufficient amount, as illustrated in Figure 3. If the same method were employed in a tube with spaced phosphors reduced in size to accommodate the surrounding

13. Figure 4 of the '368 patent is defined as a "schematic view, showing the arrangement of a triad of phosphor areas relative to the areas of impingement of the electron beams from the aperture mask in a color tube embodying the present invention." Col. 2, lines 56–59.

light absorbing material, brightness would be adversely effected, because the size of the electron beam landing areas would have to be further reduced in order to fit inside the smaller phosphor dots. The '368 patent recognizes that it is not necessary to do this because of the protective black matrix which surrounds each phosphor dot. If the size of the phosphor dot is reduced to the size of the beam landing areas in a conventional tangent phosphor tube and the size of the landing area is increased to the size of the phosphor in such a tube, the illuminated areas of the phosphor, and, accordingly, the brightness, remains the same with no loss of color purity or white uniformity tolerance. This result can be seen by comparing Figure 3 above with Figure 4 above (which correspond with Figures 3 and 4 of the '368 patent).

This feature, now known in the art as "negative tolerance" (DX 20, pp. 118–19; DX 39, p. 7), is clearly disclosed by the *specification* and *drawings* of the '368 patent (Col. 4, lines 3–46; Figures 3 and 4), as Toshiba's expert concedes (Tr. 484–86). However, as the parties agree, it is only the *claims* of a patent which are the measure of its asserted invention. 35 U.S.C. § 112; *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Toshiba argues that the '368 patent does not *claim* the negative tolerance concept, for unlike the specification, the claims refer solely to the relationship between the *mask apertures* and the phosphors and nowhere explicitly suggest that the electron *beam landing areas* should be larger than the phosphor dots.

A patent's claims, however, are not to be read in a vacuum; rather, "it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966)

(citations omitted); *Ethyl Corp. v. Borden, Inc.*, 427 F.2d 206, 209 (3rd Cir. 1970). The claims of the '368 patent do call for the mask apertures to be larger than the phosphor dots, and, as noted above, the aperture size is the same as the size of the electron beam landing area in an ordinary shadow mask tube. The patent's claims were directed to the physical design of a picture tube, not to the phenomena which would result when it was operated, and in that context it was logical to describe and claim the aperture sizes rather than the resulting beam landing area sizes. In light of the patent's explicit disclosure of the reversed beam landing area/phosphor dot relationship in its specifications, I believe this was intended to be understood in the claims.

It is true, as Toshiba points out, that this identity does not obtain in shadow mask tubes of the PDF type. In such tubes the size of the electron beam landing area is reduced by use of a focusing action which results from operating the viewing screen at a higher voltage than the mask. But in determining the scope of the invention, the relevant question is what one skilled in the art would have understood from reading the claims against the background of the specifications and I am convinced that the claims in the '368 patent, when so read, would convey the concept of negative tolerance to such an artisan. The evidence indicates that it was common practice in the art to assume, absent anything indicating otherwise, that the mask and the screen would be operated at a common voltage, and thus that the size of the apertures would determine the size of the electron beam landing areas. Toshiba's expert witness, in an article which he wrote prior to this lawsuit, spoke of the negative tolerance concept in terms of mask holes larger than phosphor dots (DX 39, p. 7), and so did Toshiba's own engineers in their technical description of their "Briteron" tube (DX 10–I, p. 2), both without mentioning

mask and screen voltages. Indeed, when Toshiba undertook to patent an ordinary-type shadow mask tube in which the beam landing areas would be wider than the phosphor stripes it employed, it did so in the same way as the '368 patent, claiming a tube with mask "slits being made wider than [the] phosphor stripes," and not mentioning the voltages of the mask or the screen (DX 11–F, p. 13). Accordingly, I find that a person skilled in the art would read the claims of the '368 patent as covering the negative tolerance concept.[14]

## V. NOVELTY

The Patent Act provides that a claimed invention is not patentable if:

. . . the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for the patent in the United States . . . .

35 U.S.C. § 102(b).

■■ The words "the invention", as used in this section, are construed strictly. A prior art reference must teach the very invention of the patent at issue in order to anticipate it. As Judge Hannum has recently said,

The test for determining if a claim of a patent has been anticipated by a prior reference is whether that reference contains, within its four corners, adequate directions for the practice of the patent claim sought to be invalidated.

*Congoleum Industries, Inc. v. Armstrong Cork Co.*, 339 F.Supp. 1036, 1052 (E.D. Pa.1972), *aff'd*, 510 F.2d 334 (3rd Cir. 1975).

Toshiba contends that United States Patent No. 2,842,697 issued to Bingley in July, 1958 ("Bingley"), constituted such an anticipation of the invention of the '368 patent. The Bingley patent, like the '368 patent, relates to improvements in color television picture tubes. It is not disputed that Bingley disclosed a shadow mask tube with spaced phosphor dots separated by black, light absorbing material (Col. 3, lines 57–65; Col. 8, line 61; Col. 9, line 1; PX 120, Admissions 28, 29, 45, 47).

Toshiba maintains that Bingley also taught the use of beam landing areas larger than the phosphor dots in a shadow mask tube, and the use of a clear viewing screen for such a tube. If he did, he would have anticipated the '368 invention.

The Bingley patent is primarily addressed to picture tubes of the index type, as described above. Index tubes do not have shadow masks; the electron beams flow unimpeded from the electron guns to the viewing screen. As a result, the size of the electron beam landing area on the viewing screen varies directly with the intensity of the beam, or in other words with the brightness of the picture being projected (this is in the nature of an electron beam; see Tr. 129, 517). It is in this context that Bingley says (Col. 2, lines 4–10):

In making the strips narrower and spacing them from one another, it becomes possible to increase the brightness of the reproduced image since the scanning beam spot size may be made larger, provided, of course, that it is not wider than the total width of a phosphor strip and the spaces adjacent it on either side.

In a shadow mask tube, by contrast, the variation in the size of the electron beam, as the brightness of the picture varies, does not affect the size of the individual electron beam landing areas, which are determined instead by the size of the mask apertures. The electron beam itself, as it strikes the shadow

---

14. The Court concludes, for this reason, that the claims do not read on the conventional PDF tube.

mask, covers a number of apertures at once (Tr. 1057). The mask acts in a manner similar to a watering-can head, which, impinged by a stream of water, allows only individual jets of small size to pass through (Tr. 82–83). When Bingley discusses the application of his invention to shadow mask tubes, he says nothing about the relationship between beam landing area and phosphor sizes (Col. 8, line 61; Col. 10, line 38), nor does he claim any such features.[15]

■ I conclude that Bingley, within its four corners, does not provide "adequate directions for the practice of" the negative tolerance concept in the context of a shadow mask tube. This does not, however, answer the question of whether the teachings of Bingley rendered obvious those of the '368 patent.

## VI. OBVIOUSNESS

Another requirement for the issuance of a valid patent is established by § 103 of the Patent Act, 35 U.S.C. § 103:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

A decision as to the obviousness of an invention calls for the application of a "practical test" which is to be made in the context of

. . . several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere*, 386 U.S. 1, 17–18, 86 S.Ct. 684, 694 (1966). I turn now to these inquiries.

## A. Scope And Content Of The Prior Art

A general discussion of the prior art and the '368 claims has already been given. It will be useful, however, to focus here upon the prior art as particularly embodied in the references cited by the Patent Office in the file of the '368 patent and in the references now cited by Toshiba as rendering the '368 subject matter obvious.

---

15. Bingley recognizes that in a shadow mask tube, as in an index tube, phosphors may harmlessly overlap onto the rear surface of the black areas, since the black material will block from the viewer any light emitted because of electrons striking those areas of phosphor (Col. 10, lines 8–19). Toshiba argues that this would only occur if the size of the electron beam landing area were larger than the size of the effective phosphor dot area, and that Bingley, therefore, implicitly recognized the use of beam landing areas larger than phosphor dots in a shadow mask tube. I agree, as did Dr. Szegho (Tr. 1050), that this is one condition under which such an effect would occur. But it is not the only such condition—the black material also protects against unwanted light emissions caused by a "wandering" electron beam bombarding a phosphor of a wrong color in the area between the effective phosphor dots (Tr. 1051–52). This being so, Bingley's teaching does not necessarily imply beam landing areas larger than phosphor dots in a shadow mask tube.

Three prior United States patents were cited in the '368 file wrapper: No. 2,795,719 to Morrell (1957); No. 2,802,964 to Jesty (1957); No. 3,005,125 to Evans, et al. (1961). The Jesty patent was cited only in connection with Claims 7 and 8 of the '368 patent which are not in issue here, and so it will not be discussed. The Morrell patent (PX 131) was cited only as an example of a disclosure of a conventional shadow mask dot-screen tube, of the sort illustrated in Figure 3.[16] The Evans patent was cited for disclosure of the use of light absorbing areas between the phosphor areas on a television tube viewing screen.[17] In an Office Action, the patent examiner initially concluded that it "would involve no invention to separate the phosphor areas of Morrell with a light absorbing material, as taught by Evans et al.," and rejected Claims 1 to 6 and 9 on this basis (PX 129, p. 18). Zenith's response was, essentially, to point out that the combination of Morrell and Evans did not result in a tube in which the mask apertures, and hence the beam landing areas, were larger than the phosphor dots, but in a tube with apertures even smaller than those of conventional tubes, and which had a resulting reduction in brightness (PX 129, pp. 21–22).[18] The application was then allowed (PX 129, p. 25), and the '368 patent issued.

Toshiba cites two prior art references which it argues rendered the invention of the '368 patent obvious: the Bingley patent, and an article by Sam H. Kaplan [19] entitled "Theory of Parallax Barriers" published in the July, 1952 issue of the Journal of the Society of Motion Picture and Television Engineers

(PX 116) (hereinafter "Kaplan"). Zenith admits that both references constitute "prior art" if they are relevant (PX 120, Admissions 1, 2, 6 and 7).

As previously noted, the Bingley patent, issued in July, 1958, teaches the construction of an index tube with spaced phosphor strips separated by black material and suggests that this concept can be applied in a dot-screen, shadow-mask tube. Also as previously noted, there is no reference in the context of this latter teaching to the relative sizes of the beam landing areas and the phosphors. To fully evaluate the question of obviousness, however, a somewhat more detailed description of the Bingley specifications is necessary. In describing the prior art, Bingley discusses the color contamination which can occur in a tangent stripe screen if the beam landing area overlaps two adjacent strips. He then states:

. . . [E]ven if the width of the area of impingement of the beam is very small, the faithful rendition of colors is extremely difficult to achieve since there are generally non-linearities in the performance of the beam deflection circuits and components, irregularities in the geometrical disposition of the elements of the beam-intercepting structure, and other practical problems which make exact coordination of beam position and beam modulation very difficult to achieve.

. . .

To a certain extent deficiencies in the rendition of colors due to the various factors mentioned above may be overcome by making the individual phosphor strips narrower and spacing

16. Morrell's invention was a method for maintaining the apertures of the shadow mask in alignment with the phosphor dots over a wide range of operating temperatures, a matter not relevant here.

17. The Evans invention was an improved method of forming an index tube screen; the use of black material was not new to Evans, and the Bingley patent was cited in the Evans file.

18. The hypothetical tube which would result from the combination of Morrell and Evans would resemble the tube illustrated in Figure 6 below.

19. Mr. Kaplan is one of the co-inventors of the '368 patent.

them from one another instead of disposing them contiguous to one another so that the scanning beam is less likely to overlap any two adjacent ones of the phosphor strips. . . . In making the strips narrower and spacing them from one another it becomes possible to increase the brightness of the reproduced image since the scanning beam spot size may be made larger, provided, of course, that it is not wider than the total width of a phosphor strip and the spaces adjacent it on either side. . . .

(Col. 1, line 46; Col. 2, line 10). Bingley immediately goes on to note that spacing causes reflection problems when utilized in a tube with a light-reflecting layer behind the phosphors, but teaches that these problems can be cured in an index tube, and the brightness advantages of the larger beam realized, if black, light absorbing material is placed in the interstices between the phosphor strips (Col. 2, lines 25–38).

The Kaplan paper, as implied by its title, is a theoretical discussion of the principle and some applications of "parallax barriers". A parallax barrier is "a masking device which, when interposed between an object space and an image space, prevents any given part of the image space from being sighted from any but a given set of predetermined directions." (PX 116, p. 11). The shadow mask used in color television picture tubes is, as the article recognizes, one example of such a barrier (PX 116, pp. 20–21), and the article specifies the geometrical conditions and mathematical equations used in the basic design of any shadow mask tube (Tr. 1069–70).

As such, it was an eminently practical teaching, and is, in regard to such basic design principles, relevant prior art.

The bulk of the article's discussion, for the sake of simplicity and clarity, proceeded on the assumption that the sources of radiation (equivalent to the electron guns in television tubes) were dimensionless "points" (PX 116, p. 20). In reality, "point sources" cannot be used in practical electronic apparatus (Tr. 386–87). Kaplan recognized that the necessary use of finite-area sources in a television tube designed according to his point-source teachings would result in electron beams bombarding phosphors of more than one color, and, at the end of his paper, he disclosed how to adjust the design of a shadow mask tube to prevent this detrimental result. There were, he taught, two alternative geometrical solutions: either the size of the aperture in the shadow mask could be reduced, thus reducing the size of the beam landing areas, or the size of the phosphor dots could be reduced, so that in the area where the beam landing areas overlapped they would not strike any phosphors at all (PX 116, p. 20).[20]

Kaplan's first alternative is the one which was adopted in conventional shadow mask tubes, and resulted in the positive tolerance situation illustrated in Figure 3. The evidence suggests that his second solution was not practiced in the art because it was not until many years later that commercially practicable techniques were developed for the production of tubes with phosphor dots smaller than the mask apertures (Tr. 634–36),[21] and because, before the use of black, light-absorbing material between

---

20. Kaplan's paper uses a somewhat different nomenclature from that of this opinion. Where he speaks of "image plan patterns" or "image elements", this opinion speaks of phosphor areas, and where he speaks of the "barrier plane", this opinion speaks of the shadow mask.

21. It was Dr. Herold's view that Mr. Kaplan himself would also have rejected his second solution as, indeed, the art discarded it (Tr. 635–36):

For making a few experimental tubes and thinking about something that might be feasible for production are two entirely different things. It was very much easier for many years not to think of making the phosphor elements smaller. So that even if Mr. Kaplan was in the picture tube business at the time, I doubt if he would have chosen at that time to choose this second solution.

spaced phosphor dots was taught by Bingley, such a tube would have reflected room light back at the viewer like a mirror because of the aluminum layer behind the spaces between the phosphors (cf. Tr. 584, 1005).

Following Kaplan's second teaching does result in a tube in which the beam landing areas are larger than their corresponding spaced phosphor dots, but it does not necessarily result in the negative tolerance tube of the '368 patent. The screen geometry resulting from following Kaplan's second solution can be illustrated thus:

phosphor dots

outer limits of electron beam landing areas

Figure 5.   Screen geometry of Kaplan's "second solution".

Zenith points out that this diagram reveals a "zero tolerance" condition, so far as color purity is concerned, since, as can be seen, any movement of an electron beam landing area will cause it to impinge on another phosphor dot (Tr. 656–57, 1080–81). Toshiba responds, however, that there is a "built-in tolerance" in the illustrated tube (Tr. 423) since it was well known that the "theoretical" beam landing area which Kaplan depicted (i.e., that screen area large enough to encompass the impact points of all electrons) exceeds the "effective" beam landing area (i.e., that screen area receiving a sufficient concentration of electrons to cause a phosphor to fluoresce). I agree that this is so.[22] Since, however, the particular dimensions of this tolerance depend, in any given tube, on the details of its design, it cannot be said that the Kaplan Article's suggestion, illustrated in Figure 5, would *necessarily* represent a tube with *effective* beam landing areas larger than its phosphor dots (Tr. 1056–60).

### B.   *The Level Of Ordinary Skill In The Art*

Zenith's expert, Dr. Szegho, testified that in his own research department in 1961 there were eight or ten profession-

22. This "built-in tolerance" results from what is called the "penumbra" effect. This phenomenon results in an unequal distribution of electrons within the theoretical beam landing area on the screen, with a higher concentration in the central portion of that landing area than at its periphery (Tr. 423–25; 1057–58).

al people, and another half dozen skilled technicians, all working on new concepts and variations in color picture tubes (Tr. 159–60). In Zenith's engineering department, which did the actual designing of color tubes for production, there were probably twenty-five or more graduate engineers, as well as many other skilled workers, many with substantial experience in the field (Tr. 160–61). All the research people, and at least some of the designers, would have been familiar with developments in the fields of shadow mask, PDF, and index tube design (Tr. 116, 161–63, 576). Dr. Szegho, for example, himself holds some patents relating to PDF tubes (Tr. 197).

Toshiba's expert, Dr. Herold, was in charge of RCA's crash program to develop a compatible color picture tube in 1949–50 (Tr. 331–32). He testified that at that time there were about seventy professional people working on the project, with an average of ten to fifteen years' experience (Tr. 350). While the number of people involved in color picture tube work probably declined after the crash programs' goals had been accomplished, it is perhaps reasonable to assume that the level of skill and experience remained comparably high. Dr. Herold testified that he himself was familiar with PDF and index, as well as shadow mask tubes and that all three types were widely known among those in the field in 1960 (Tr. 346–47, 576).

## C. *The Subtests*

Zenith relies heavily on what it calls the "judgment of history" to show that the '368 tube was an invention of dramatic non-obviousness. This judgment is said to be revealed in the "secondary considerations [such] as commercial success, long felt but unsolved needs, failure of others, etc." which the *John Deere* court said "might have relevancy" to the inquiry. *Graham v. John Deere Co.*, *supra*, 383 U.S., at 17–18, 86 S.Ct. at 694. Zenith's proof on these issues can be briefly summarized.

### (1) *Improved results*

The quest for increased brightness consistent with acceptable contrast has been an industry goal from the beginning. Continual, but slow, progress had been made up to 1969, when the negative tolerance concept was first practiced commercially in Zenith's "Chromacolor" tube (DX 20, p. 210; DX 30, p. 7). This tube had a significantly better picture than prior tubes, achieving, for example, increased brightness of 90% and increased contrast of 26% over Zenith's own conventional tubes (Tr. 262–63), and representing a sharp improvement in industry achievement generally (DX 20, p. 210).

### (2) *Industry recognition*

Both Toshiba's expert in this case, and Toshiba's own engineers, have recognized the merit of the negative tolerance tube. Dr. Herold wrote, in a paper published in an RCA house organ:

About 1969, both RCA and Zenith announced shadow mask tubes that used a black matrix on the face plate, with round openings that permitted the phosphor dots to be seen. Only the Zenith version, published in 1969 by J. P. Fiore and S. H. Kaplan is described, because it gives the largest improvement and is now available from most manufacturers, including RCA.

The result is most gratifying. Because the screen now has about 50% of its area covered by black, the backscattered ambient light is cut in half just as with 50% gray glass, *but there is now no reduction in brightness*. In other words, the picture is twice as bright as the gray-glass tube for the same contrast.

The numbers used are illustrative only. (DX 39, p. 7) (emphasis in original; footnotes omitted).

Similarly, Toshiba's engineer Yasuo Ohota wrote, in a paper published in 1973 by the Institute of Electrical Engineers of Japan:

It is fresh in one's memory that improvement in brightness by 50 to 60%

was achieved without labor due to the black matrix developed by Rauland [Zenith's picture tube division].
(DX 11–D, translation p. 2).

### (3) *Commercial success*

Tubes incorporating the negative tolerance concept have had a rousing success in the industry. Zenith now manufactures only negative tolerance tubes (except for production at one newly acquired plant which has not yet been modernized); RCA, Westinghouse, General Electric and Sylvania—the only other color television tube manufacturers in the United · States—all make negative tolerance tubes; RCA makes no other type for sale in its own label sets (Tr. 243–48).[23] Three major Japanese manufacturers—Hitachi, Mitsubishi and Matsushita—all produce negative tolerance tubes under license from Zenith (DX 13A, B, 14A, B, 15A, B; Tr. 909–10).

### D. *Evaluation*

The Patent Act, 35 U.S.C. § 282, provides that:

A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it.  .  .  .

In evaluating the evidence adduced,

.  .  .  the proper way to apply the [§] 103 obviousness test to a case like this is to  .  .  .  picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him.  .  .  .

*Application of Winslow*, 365 F.2d 1017, 1020, 53 CCPA 1574 (1966).

Bearing in mind both Toshiba's burden and Zenith's presumptive knowledge of the relevant prior art, I find that both the Bingley patent alone, and the combination of Bingley with Kaplan, contain such disclosures that the subject matter of the '368 patent, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art.

### (1) *Bingley*

The hypothetical artisan sitting in a room with walls displaying the state of the art at the time of Bingley would have been familiar with (1) the basic shadow mask tube design, (2) the concept that reflection of ambient light could be substantially reduced, and contrast thereby substantially improved, by spacing the phosphors and placing light absorbing material in the interstices, (3) the concept that substitution of clear glass for gray would improve brightness, though at the cost of some sacrifice in contrast, (4) the concept that the geometric relationship on the screen plane between beam landing area and phosphor area had to provide color purity and white uniformity tolerance to compensate for such things as manufacturing errors, and (5) the teaching that by spacing of the phosphor strips in an index tube and surrounding them with light absorbing material it becomes practicable to have a beam landing area larger than the width of the phosphor.

Had this hypothetical artisan set out to incorporate Bingley's spaced-phosphor-dot, primary teaching into a conventional shadow mask tube, I conclude that he would have been led inexorably to the concept embodied in the '368 patent.[24]

---

23. RCA manufactures such tubes under a general cross-licensing agreement with Zenith which gives each company the right to utilize all of the other company's patents (DX 32, 33; Tr. 910, 917–18). The other United States producers do not have licenses from Zenith.

24. By so concluding, I do not suggest merely that the '368 patent is a logical extension of Bingley's primary teaching that contrast could be improved by spacing the phosphors and placing light absorbing material in the interstices. Every invention, when viewed with hindsight, is, in some sense, a logical extrapolation from the prior art. In the present case, however, I suggest that basic and well established concepts would have made the possible alternatives obvious and would have deterred the skilled from reaching any other end result.

The skilled artisan would have known from Bingley that as he reduced the size of the phosphor and added light absorbing material in the space thus made available, he would gradually increase contrast at no cost to brightness until he reached a phosphor the size of the beam landing area. Having reduced the phosphor to this degree, he would be left with no white uniformity or leaving tolerance and would, accordingly, have been confronted with the question of what adjustment to make in the beam landing area. As a matter of simple geometry there would, of course, be two alternatives. Given the then current industry practice of using a positive tolerance approach, the artisan might, as Zenith has suggested, have instinctively thought to reduce the beam landing area in order to maintain the customary guardband *within* the phosphor dot. This would have produced the screen geometry depicted in Figure 6.

outer limits of electron beam landing areas

phosphor dots

black material

"guardband"

Figure 6.

Had he taken this step, however, it seems to the Court that a person with the high level of skill which was ordinary in the art, looking at a diagram of such a tube, would first have regretted the loss of brightness inherent in reducing the size of the landing areas to maintain the proper guardband within the now-reduced-in-size phosphor dots and then would quickly have perceived that there was no longer any need to maintain this particular relationship—that leaving tolerance could be insured, without any loss of clipping tolerance, by increasing the size of the beam landing areas, so long as a guardband of the width customary in prior art tubes was preserved between the outer edge of each beam landing area and adjacent phosphor dots.[25] Having thus conceived

25. This seemed to the Court to be the import of Dr. Herold's testimony (e. g. Tr. 608–610). The fact that RCA introduced a positive tolerance black matrix tube, like the

of the screen geometry illustrated in Figure 4 of the '368 patent, the addition of clear glass to improve brightness would have been an obvious next step. Accordingly, I hold that the '368 patent was obvious in light of Bingley's primary teaching that contrast could be improved in a shadow mask tube by spacing the phosphors and placing light absorbing material in the interstices.[26]

Moreover, this primary teaching was not the only thing in Bingley which would have been of aid to an artisan attempting to take advantage of that teaching in a shadow mask context and, at the same time, avoid the obvious loss of brightness that would result from a reduction in the size of the beam landing areas. There were the additional disclosures,[27] made in the context of a discussion involving, *inter alia*, provisions for tolerance, that when phosphors are spaced and surrounded by black material it becomes practical to have a beam landing area larger than the phosphor, so long as its size does not exceed the total size of the phosphor area and the black material on each side of it (see Bingley—PX 122 at Col. 2, lines 4–10). I believe that it would have occurred to a skilled artisan, confronted with the problem I have outlined to apply this

teaching to a shadow mask tube and that such an application would have resulted in the '368 tube.

Zenith argues, however, that because the negative tolerance concept was explicitly suggested by Bingley only in the context of an index tube, which differs in a number of important ways from a shadow mask tube (see Tr. 1013–18), this disclosure of Bingley's was not within "the art to which one [of ordinary skill in the art could] reasonably be expected to look for a solution of the problem which the patented device attempt[ed] to solve." *Burgess Cellulose Co. v. Wood Flong Corp.*, 431 F.2d 505, 509 (2nd Cir. 1970). My finding is to the contrary.

Researchers in the shadow mask tube were well aware of developments in the index tube field and, while index tubes and shadow mask tubes do differ in a number of ways, as I have previously noted, their similarities, in the present context, are more significant than their differences. As Zenith's expert, Dr. Szegho, put it in both instances, the place where the action is is the fluorescent screen." (Tr. 200). As Bingley's observations about index tube design suggest, the need to provide tolerance

one illustrated in Figure 6, is not proof that the negative tolerance idea was not obvious to them. As Zenith has stressed, there were very difficult problems of production technique which had to be overcome before a screen with aperture holes larger than phosphor dots could be made commercially; problems which Zenith itself did not solve until 1968 or 1969 (Tr. 152–53). Dr. Herold testified that RCA had in fact given a great deal of thought to producing a negative tolerance tube during 1968–69, but rejected the idea for various practical reasons (Tr. 494–95). But he was absent from RCA from 1959 through 1964, and did not know whether anyone there, or anyone at Philco (Bingley's employer) had actually made a negative tolerance tube prior to the issuance of the '368 patent (Tr. 569–72).

26. In so holding, I acknowledge that the patent examiner found the '368 patent non-obvious over comparable prior art. As noted

above, the combination of Morrell and Evans cited against the '368 application by the examiner seems to me to be equivalent to what I have just described as the primary teaching of Bingley. Morrell's screen, modified to allow for Evans' black material, would result in a tube as illustrated in Figure 6, just as Bingley's primary teaching would. But having initially rejected Claims 1 to 6 and 9 of the '368 application in view of Morrell and Evans, the examiner was persuaded to allow the patent after Zenith more explicitly explained its negative tolerance concept and the advantages it gave over a tube of the kind represented by Figure 6 (PX 129, pp. 18, 21–23, 25). I conclude, however, that Toshiba on the record before me has overcome the presumption of validity to which this ruling of the examiner gives rise.

27. Present in Bingley but not in Morrell or Evans and, accordingly, not before the examiner.

when selecting screen geometry is common to both types of tubes.[28] Moreover, there is nothing inherent in the manufacture or operation of a shadow mask screen which would make Bingley's screen geometry suggestion for solving the tolerance problem in an index tube difficult of application in a shadow mask tube. To these facts must be added the fact, already stressed, that Bingley's *express* suggestion for shadow mask tubes, if pursued with a beam size smaller than the reduced phosphors, would obviously result in a sacrifice of brightness. Given this context, I believe that one skilled in the art would have found it obvious to apply Bingley's screen geometry solution for index tubes to a shadow mask tube.[29]

### (2) *Bingley and Kaplan combined*

Alternatively, I find that the subject matter of the '368 patent was obvious to a person of ordinary skill in the art in view of the combination of Bingley with Kaplan. As noted above, the "second solution" of the Kaplan article to the problem of color contamination in a practical shadow mask tube was to separate and reduce the size of phosphor dots without changing the size of the mask apertures. Both Zenith's experts and Mr. Kaplan himself have admitted that this "solution" results in a tube with beam landing areas larger than the phosphor dots (Tr. 1068, PX 119, pp. 66–70). To be sure, Kaplan's paper does speak of *theoretical* landing areas larger than the phosphor dots and such a condition does not *necessarily* involve *effective* landing

areas larger than those dots. But this does not deprive the Kaplan paper of relevance in the current context. The relevant inquiry is what would have occurred to a skilled artisan attempting to secure in a shadow mask tube the advantages of using black material between spaced phosphor dots without a concomitant loss of brightness. In this context, an examination of Kaplan's shadow mask tube teaching of theoretical landing areas larger than phosphor dots would have virtually compelled consideration of a comparable relationship between *effective* landing areas and the phosphor dots and of the utility of such a relationship in providing tolerance without loss of brightness.

Accordingly, I hold that the '368 patent was obvious in view of the combination of Kaplan and Bingley.

### (3) *The secondary tests*

■ The keystone of Zenith's argument against the foregoing conclusion of obviousness—that those in the art did not, in fact, see what is alleged to have been obvious to them—cannot in this case bear the weight which is sought to be placed upon it. Such an argument grows in persuasiveness as the time lengthens during which the prior art relied upon was in the public ken. Where, as here, the prior art (Bingley, issued July 8, 1958) was only available for eight months before the alleged invention was described in a writing (DX 2, March 5, 1959), the argument loses its force.[30]

---

28. It is true as I have noted in considering the novelty question, that some of the sources of the tolerance problem in an index tube are not present in a shadow mask tube. But, as Bingley indicated by his reference to "irregularities in the geometric disposition of the elements of the" screen the tolerance problem has common sources in both instances.

29. The fact that the Canadian examiner had Bingley itself before him when he issued the '368's corresponding Canadian patent (No. 710,943 to Fiore and Kaplan (1965)) gives

pause, but no more. When defending its application against his initial rejection, Zenith called his attention only to the part of Bingley dealing explicitly with shadow mask tubes (see DX-27, p. 24).

30. Zenith stresses that Bingley himself was familiar with his patent for nine years prior to the issuance of the '368 patent and argues that he would have thought of applying of his screen geometry to a shadow mask tube if it were obvious from his patent. First, it is far from clear from the record that Bingley did not conceive of using

■ I do not question that when Zenith finally managed to solve the production problem inherent in utilizing the concept of the '368 patent in a commercial tube, its accomplishment represented a substantial improvement over prior tubes. The Chromacolor tube clearly met with significant commercial success. But the Chromacolor tube and the manufacturing techniques by which it is produced are not the subject of the '368 patent. The Court's inquiry must go to the concept in fact taught by that patent and on this record, the secondary evidence does not convince me that that concept was not obvious after Bingley.[31]

## VII. ZENITH'S CONDUCT BEFORE THE PATENT OFFICE

Toshiba additionally urges that the '368 patent should be declared unenforceable and attorney's fees awarded because Zenith withheld from the Patent Office citation of the closest prior art of which it was aware—the Bingley patent and the Kaplan article. There is no substantial dispute as to the facts regarding Zenith's prosecution of the application for the '368 patent.

On or about March 5, 1959, J. P. Fiore and S. H. Kaplan, the co-inventors of the '368 patent, submitted a memorandum outlining their invention to Dr. Szegho, the head of Zenith's tube research department, "for discussion and to open a patent docket" (DX 2, p. 4). A docket was opened, and assigned to

one William Klebansky, an employee in the Zenith patent department who had had substantial practical experience in the patent drafting field but was neither a lawyer nor an agent licensed to practice before the patent office. (Tr. 876–77). He prepared a draft application which, after having been edited and revised by John J. Pederson, the Assistant Manager of the patent department, was duly filed on April 4, 1961.

In his work on this invention, Klebansky became familiar with certain prior patents, and, after the application had been filed, he recorded these references on what Zenith refers to as its Application Data Form, in accordance with its standard practice. Under the heading "State closest prior art," he listed the Bingley patent and two British patents (PX 139, Tr. 880, 891). Nothing in the record suggests, however, that Klebansky viewed Bingley as rendering the '368 invention obvious or as being more relevant than the combination of Morrell and Evans subsequently cited by the examiner.[32]

On February 26, 1962 the patent examiner issued an Office Action rejecting claims 1–6 and 9 of the application over the prior art references of Morrell (PX 131) and Evans (PX 132), discussed above (PX 129, p. 18).

A responsive amendment distinguishing the invention from the art taught by Morrell and Evans was prepared by Klebansky, reviewed by Hugh Drake,[33] a

---

negative tolerance in a shadow mask tube. Second, the record does suggest that, for at least a substantial portion of this time, Bingley and his colleagues were absorbed in an attempt to perfect an index tube (i. e. the "Apple tube"), and his experience during this period would not be indicative of what would have occurred to one skilled in the art, who was engaged in an effort to perfect the shadow mask tube.

31. I should also note that the evidence regarding licensing of the '368 patent provides no persuasive support for the validity of that patent.

32. Mr. Klebansky died prior to the filing of this action, so his testimony was not available to the Court. The record which he left in the file, however, does not evidence any particular concern about what he cited on the Application Data Form as the "closest prior art".

33. Mr Drake undertook this review because of Mr. Pederson's absence from the office in connection with patent litigation.

senior attorney in the patent department, and filed on June 4, 1962 (PX 129, pp. 20–24; Tr. 883). Mr. Drake testified that it was not his practice in situations of this kind where he was reviewing someone else's work to closely examine prior art previously uncovered and reviewed (Tr. 722–26).

A notice of allowance was issued on December 23, 1963 (PX 129, p. 25). Thereafter, Jerry Wright, another attorney in Zenith's patent department, conducted a final review of the application prior to issuance. On the appropriate form, in answer to the question "Is there any known prior art, more pertinent than that cited by the examiner, which has not been made of record?," he replied "No" (DX 24, Tr. 743). Like Mr. Drake, Mr. Wright had little specific recollection about what he did in the course of this review twelve years ago. He testified, however, that while his practice was to read through all prior art referred to in the file, he probably relied primarily on a conversation with Sam Kaplan in which Kaplan explained the Bingley disclosure (Tr. 788–89).[34]

Following Wright's review, his supervisor, Mr. Pederson, also reviewed the file. He testified that he did not believe he "could have signed off on that [final review] form without having [Bingley] in front of" him, and without having come to a judgment that the form was properly completed (Tr. 903–04, 888). When Mr. Pederson conducted his initial and final reviews, he also had knowledge of the Kaplan article, in the sense that it had previously been called to his attention. There is no evidence, however, that he reviewed or considered it in connection with his prosecution of the '368 patent application.

After incorporation of the minor amendments prepared by Wright, the patent issued on August 25, 1964 (PX 129, pp. 26–28, 1).

I have previously held that the disclosure of the '368 patent was obvious in light of Bingley and in light of Bingley combined with the Kaplan article. It does not necessarily follow, however, that Zenith's failure to bring these two concededly known references to the attention of the examiner constituted fraud on the Patent Office. *Scott Paper Company v. Fort Howard Paper Company*, 432 F.2d 1198 (7th Cir. 1970). One making such a claim has the burden of clearly demonstrating not only objective "materiality" or "relevance" but also "an element of willful, wrongful conduct or wrongful intent." *In re Frost Patent Litigation*, 398 F.Supp. 1353, at 1366 (D. Del.1975).

A patent attorney has no absolute duty to perceive that which one skilled in the art would have perceived if left in a room to study a display of all the prior art. His duty is one of candor and this duty leaves room for the exercise of good faith judgment even if that judgment ultimately is held to have been faulty. As Judge Mansfield has said:

> We believe . . . that an applicant for a patent should be accorded the right to exercise good faith judgment in deciding what matters are and are not of sufficient relevance and materiality to require disclosure. Only when he is guilty of fraud, willfulness or recklessness indicating a disregard for his duty of frankness should enforcement of the patent be barred.

---

34. Toshiba does not level the charge of fraud against Dr. Kaplan. There is no evidence in the record that he in fact got his idea for negative tolerance as a result of reading the Bingley disclosure or that he subjectively focused at any relevant time on the negative tolerance teachings of Bingley in the context of a shadow mask tube.

*Xerox Corp. v. Dennison Mfg. Corp.*, 322 F.Supp. 963, 968–69 (S.D.N.Y.1971).[35]

■ Toshiba has proved that Mr. Klebansky and two patent attorneys at Zenith were aware of and considered Bingley at the time of the prosecution of the '368 patent. It has not convinced the Court, however, that the failure to call the examiner's attention to Bingley was the result of anything other than good faith judgments that Bingley was no more relevant than the combination of Morrell and Evans cited by the examiner.[36] Bearing in mind that Bingley did not directly teach negative tolerance in the context of a shadow mask tube, it is understandable that a patent attorney prosecuting the '368 patent with reasonable diligence might focus on Bingley's teaching concerning index tubes while failing to perceive the relevance of the negative tolerance teaching in the shadow mask tube context. Such an attorney could, as I believe the Zenith personnel[37] did, conclude in good faith that Bingley was no more relevant than the examiner's prior art.

■ The situation with respect to the Kaplan paper is somewhat different but the result must be the same. While the Kaplan paper was known to Pederson, there is no evidence that he reviewed it in connection with the prosecution of the '368 patent and I consider it likely that he simply failed to think of that portion of the paper which the teachings of Bingley cast in a new light. If there were any evidence that the Kaplan paper had been recognized as relevant in the course of the prosecution, as Bingley was, a more difficult question would be posed. But the mere failure to call a given relevant reference to mind in the course of the prosecution does not, on the facts of this case, amount to a wanton disregard of a duty owed to the Patent Office.

Accordingly, I find, "under the 'totality of circumstances,'" *Monsanto Co. v. Rohm & Haas Co., supra*, 456 F.2d at 600, that the '368 patent was not inequitably obtained, and that no award of attorney's fees against Zenith, as prayed for by Toshiba, would be justified.

## VIII. INFRINGEMENT

Assuming, *arguendo*, that the '368 patent were valid and enforceable, I turn to the issue of infringement. Toshiba's "Blackstripe" tube, the alleged infringer, is a shadow mask tube in which the phosphor areas are deposited on the viewing screen not in discrete dots, but in vertical stripes which continue unbroken from the top to the bottom of the screen. Each phosphor stripe is separated from its neighbors by a black stripe. The tube's aperture mask is perforated not by circular holes, but by vertical slots, one slot for each triad of color stripes. The slots are not, however, continuous for the length of the mask, but are periodically interrupted by "tie bars" or "bridges" so as to form

35. This position is not in conflict with Judge McLean's standard—the "intentional nondisclosure of relevant data"—in *SCM Corp. v. Radio Corp. of America*, 318 F.Supp. 433, 448 (S.D.N.Y.1970), since he found in that case that the patentee knew the information it had submitted to the Patent Office was inaccurate in the absence of the qualifying data it withheld. *Id.*, at 447. Nor is this position inconsistent with that of the Court of Customs and Patent Appeals as expressed in *Norton v. Curtis*, 433 F.2d 779, 57 CCPA 1384 (1970), where Judge Baldwin noted that a showing of misrepresentation attributable to gross negligence might overcome a showing of subjective good faith, and be sufficient to make out the "fraud" defense. *Id.*, at 795–96.

36. Toshiba argues not only that there was deliberate fraud but also that the record shows at least gross negligence on the part of Zenith's patent department. While the record does evidence a failure of Zenith's carefully designed internal review procedures to achieve fully their intended objective, I cannot characterize the overall conduct of Zenith's staff as grossly negligent.

37. I. e., Klebansky, Wright and Pederson.

a series of rectangular openings (PX 108). Thus, the operation of the Black- stripe tube can be illustrated in this manner:[38]

Figure 7.  Toshiba's "Blackstripe" tube.

■■■■ Zenith, which has the burden of proof on this issue, *Congoleum Industries, Inc. v. Armstrong Cork Co.*, 339 F.Supp. 1036, 1061 (E.D.Pa.1972), *aff'd* 510 F.2d 334 (3rd Cir. 1975), concedes that the Blackstripe tube does not literally infringe the claims of the '368 patent, since the claims call for "apertures individually larger than  .  .  . phosphor areas," while the Blackstripe apertures, though wider than the phosphor stripes, are much shorter, and thus smaller in total area.  Zenith asserts, however, that the Blackstripe tube employs the teachings of the '368 patent in order to obtain the advantages that the patent disclosed, and, therefore, infringes it under the doctrine of "equivalents".  That doctrine serves the purpose of preventing another from making

.  .  . unimportant and insubstantial changes and substitutions in the patent which, though adding nothing,

38.  Figure 7 is comparable to Figure 2 of PX '108, Toshiba's own representation of their tube.

would be enough to take the copied matter outside the claim, and hence outside the reach of law.

*Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). The doctrine applies, establishing infringement,

. . . where the infringing product performs substantially the same function in substantially the same way to obtain the same result as the patented product.

*Burgess Cellulose Co. v. Wood Flong Corp.*, 431 F.2d 505, 507 (2nd Cir. 1970).

The Blackstripe tube, Zenith notes, uses the '368 teaching of a beam landing area larger than phosphor area surrounded by black material in the horizontal direction—the only direction in which manufacturing tolerance is needed in a stripe-screen tube—in order to achieve increased contrast without loss of brightness or manufacturing tolerance (Tr. 105–07). The tube then follows the '368 teaching to use clear glass, further enhancing its brightness without reducing contrast below acceptable levels (DX 17–A), as called for in Claim 3 of the '368 patent.

■ Toshiba responds in three ways. First, it points out that the Blackstripe tube is unlike Zenith's Chromacolor tube in many ways—using phosphor stripes instead of dots, using an "in-line" rather than triangular arrangement of electron guns (DX 17–A), and being simpler and less costly to manufacture (Tr. 820–25). These facts seem to the Court irrelevant. Zenith's Chromacolor tube is not involved in this case; it is the '368 patent which is alleged to have been infringed. That patent makes no claims relating to gun placement or manufacturing economy, and I find that its claims are broad enough to cover the application of its teachings in a single direction as well as in all directions, and to phosphor configurations of many types, including stripes. Utilizing the teachings in only

one direction, or varying the shape of the phosphor areas from dots to stripes are, in this context, "unimportant and insubstantial change[s]" which, if permitted to result in a finding of non-infringement here, would be "plac[ing] the inventor [of the '368 patent] at the mercy of verbalism and would be subordinating substance to form." *Graver Tank & Mfg. Co. v. Linde Air Products Co., supra,* 339 U.S., at 607, 70 S.Ct. at 856. The doctrine of equivalents protects against such a result.

Toshiba's second response is that the Blackstripe tube in fact practices only the art taught by Bingley, and does so under license (See PX 183, ¶ 4). The efficacy of this argument depends upon Toshiba's parallel argument that Bingley anticipated the '368 patent, for if '368 taught something additional to Bingley, then a tube which utilizes that additional teaching is not saved from infringing it by the fact that it may also utilize whatever Bingley taught. *See Cantrell v. Wallick,* 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017 (1886). Since I have concluded above that Bingley did not anticipate the '368 patent, this argument is of no avail to Toshiba here.

■ Toshiba's third argument focuses on the Blackstripe tube's feature of uninterrupted stripes of phosphor material extending for the length of the screen. Even though the phosphor areas behind the mask's tie-bars are shaded from electron bombardment, the continuity of the stripes, according to Toshiba, performs two important functions: preventing Moiré (Tr. 280–81, 289, 815–17) ("Moiré" is an effect resulting from the inter-action of two periodic functions, and manifests itself on the television screen in the form of wavy lines (Tr. 287–88)), and giving the tube an increased amount of white uniformity ("leaving") tolerance in the vertical direction (Tr. 814). Granting, as I do, that the continuous phosphor stripes are designed to and do serve these purposes, I nevertheless find that the Blackstripe tube utilizes the invention of the '368

patent in the manner taught by the patent, and in order to gain the benefit described therein. It practices, in the horizontal direction, the '368 patent's negative tolerance design, by having its mask apertures wider than the width of its phosphor stripes (with equal mask and screen voltages), and a clear glass viewing screen; it achieves thereby an improved combination of brightness and contrast, while retaining the necessary manufacturing tolerances for preserving both color purity and white uniformity. Toshiba itself has acknowledged the Blackstripe tube's debt to the '368 invention in its application for a United States patent on the tube (DX 11–F, pp. 2–3), and in its engineer Ohota's paper on the subject (DX 11–D, pp. 2–3). Indeed, both Toshiba's expert witness, Dr. Herold, and one of its chief engineers, Dr. Asahide Tsuneta, agreed that the Blackstripe tube had negative tolerance in the horizontal direction (Tr. 371, 386). Whatever additional characteristics the Blackstripe may possess, if it utilizes without license the teaching of the patent, in the manner shown by the patent, and in order to obtain the advantages described by the patent, then it infringes the patent. *Tempco Co. v. Apco Co.*, 275 U.S. 319, 328, 48 S.Ct. 170, 72 L.Ed. 298 (1928); *Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co.*, 169 F.Supp. 1, 9 (E.D.Pa.1958), *aff'd* 268 F.2d 395 (3rd Cir.), *cert. denied*, 361 U.S. 894, 80 S.Ct. 190, 4 L. Ed.2d 151 (1959); *Zeigler v. Phillips Petroleum Co.*, 483 F.2d 858, 871 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S. Ct. 597, 38 L.Ed.2d 485 (1973).

I, therefore, conclude that the Toshiba Blackstripe tube infringes the '368 patent.

## IX. SUMMARY

For the reasons given above, I have concluded that Claims 1 to 6 and 9 of the '368 patent are not invalid for lack of novelty or because of the manner in which they were obtained, and that Claims 1, 2, 3, 5, 6 and 9 are infringed by the Toshiba Blackstripe tube. I have concluded, however, that Claims 1 to 6 and 9 are invalid for obviousness. A judgment will be entered declaring the invalidity of the patent. No award of attorney's fees is justified.

Submit order.