**TOKYO SHIBAURA ELECTRIC CO. LTD., et al.**

v.

**ZENITH RADIO CORPORATION,**
**Appellant.**

**No. 76–1237.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 8, 1976.

Decided Jan. 7, 1977.

Thomas S. Lodge, Wilmington, Del., Dugald S. McDougall, McDougall, Hersh & Scott, Chicago, Ill., for appellant.

James M. Tunnell, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Edward F. McKie, Jr., Dale H. Hoscheit, Schuyler, Birch, Swindler, McKie & Beckett, Washington, D.C., for appellee.

Before VAN DUSEN and ROSENN, Circuit Judges, and CAHN,* District Judge.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

The quest to improve the brightness and contrast of the color television picture tube forms the backdrop of this appeal. The appellees, a Japanese company and its United States subsidiaries (hereinafter referred to collectively as "Toshiba"), brought an action against Zenith Radio Corporation ("Zenith") seeking a declaration of the invalidity, non-infringement, and unenforceability of Zenith's United States Letters Patent No. 3,146,368 ("the '368 patent").[1] Zenith counterclaimed, alleging that Toshiba's Blackstripe picture tube infringed the '368 patent. The district court decided that Claims 1, 2, 3, 4, 5, 6, and 9 of the '368 patent were not invalid for lack of novelty or because of the manner in which they were obtained, and that, assuming the patent to be valid and enforceable, those claims were infringed by the Blackstripe tube. The court also determined, however, that the color picture tube concepts embodied in the '368 patent were obvious in view of the prior art, and that the patent was therefore

invalid under 35 U.S.C. § 103 (1970).[2] *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 404 F.Supp. 547 (D. Del. 1975). The sole issue presented on appeal is whether Zenith's patent is invalid for obviousness.[3] After a thorough review of the record, we conclude that it is, and affirm the judgment of the district court.

### I.

The facts of this case, including a comprehensive exposition of the state of color picture tube technology prior to the '368 patent, are recited with commendable clarity in the reported opinion of the district court. 404 F.Supp. at 550–58. We shall therefore sketch only the essential details.

In a conventional color tube produced commercially prior to the '368 patent, the inside surface of the viewing screen is coated with tangent triads of phosphor dots. Each triad is composed of phosphors—chemical materials which, when bombarded by electron beams emanating from a cluster of three guns mounted in the neck of the tube, emit the colors of either red, green, or blue. Any visible color can be reproduced by bombarding the appropriate combination of these phosphors, and the brightness of the emitted colors can be regulated by varying the intensity of bombardment.

Accuracy of color reproduction requires that the electron beam bombard the proper phosphor at the proper time with the proper intensity. Every commercially available

* Edward N. Cahn of the United States District Court for the Eastern District of Pennsylvania sitting by designation.

1. The patent was issued on August 25, 1964, to Joseph P. Fiore and Sam H. Kaplan, who assigned their rights to the Rauland Corporation. Rauland, a wholly-owned subsidiary of Zenith, was merged into the parent corporation effective November 30, 1968. Consequently, Zenith is now the record owner of the '368 patent. Zenith's Chromacolor picture tube employs the concepts taught by the '368 patent.

2. 35 U.S.C. § 103 (1970) provides:
   A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title [relating to novelty], if the differences between the subject matter sought to be patent-

ed and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

3. Toshiba initially cross-appealed from those paragraphs of the judgment decreeing that the patent in suit was not invalid for lack of novelty under 35 U.S.C. § 102 (1970), *as amended* (Supp. III 1973), or because of the manner in which those claims were obtained, and that no award of attorneys' fees was justified. Toshiba subsequently decided not to press the cross-appeal.

color television set today employs a "shadow mask" to enhance precision in color selection. The mask, a thin metal membrane positioned immediately behind and parallel to the screen, is perforated with a large number of small apertures; each aperture is located directly behind the center of a triad of tangent phosphor dots, one emitting red light, one blue, and one green. In a shadow mask tube, each of the three electron guns emits electrons intended to strike only the phosphors of a given color.[4] The guns, the mask, and the screen are so situated that the beams from the three guns converge at the mask, with each beam at a different angle. As a consequence, only so much of each beam as will strike the proper phosphor is able to penetrate the mask. The following cross-sectional view illustrates the design of a shadow mask tube:[5]

Figure 1. Basic Design of Shadow Mask Tubes.

Ideally, the landing areas of the electron beams would be exactly coincidental with the proper phosphor areas on the screen. Perfect registration of the electron beams, however, demands a precision of mask and screen alignment that is unattainable in a mass production context. In order to achieve accurate color reproduction, it is therefore necessary to incorporate a tolerance for fabrication and alignment errors into the design of the tube.

All tubes sold commercially prior to the '368 patent allowed for manufacturing errors by making the apertures in the shadow mask slightly smaller than the phosphor

dots on the screen. The beam landing areas on the screen, in turn, were smaller than the phosphor dots that they were intended to strike. A "guardband" surrounding the beam landing area within the phosphor resulted, ensuring accurate color reproduction even if a beam wandered slightly because of misalignment of the mask and screen. This method of providing an allowance for manufacturing errors is known today as "positive tolerance."

The conventional shadow mask tube had several disadvantages. For example, the phosphors that were not being bombarded at any given moment reflected room light, reducing contrast. Because the phosphor dots lay tangent to one another, they virtually covered the screen and reflected a large amount of room light back at the television viewer. Contrast could be improved by constructing the viewing screen of gray, light-absorbing glass, but this had the side effect of reducing picture brightness.

The '368 patent solved some of the most obvious problems of the conventional shadow mask tube. Claim 1 of the patent describes a shadow mask tube in which the phosphor areas on the screen are "spaced from all adjacent such areas by intermediate light absorbing areas," and in which the mask itself is perforated by apertures that are larger than the phosphor dots. Such a tube provides better picture contrast than the conventional tube: Because less screen area is covered by phosphors, and because a significant portion of the screen is covered by black, light-absorbing material, much less room light is reflected back at the viewer. Moreover, the increased contrast permits the use of a clear glass viewing screen, which improves brightness.

To use the positive tolerance concept in the '368 tube would adversely affect brightness. The spaced phosphors in the '368 design are reduced in size to accommodate the surrounding light-absorbing material; if the electron beam landing areas were

---

4. The phosphors themselves are actually whitish except when being bombarded by electrons. For convenience, we shall refer to the phosphors by the color they emit when bombarded.

5. This freehand diagram is reproduced from Judge Stapleton's opinion, 404 F.Supp. at 551.

made even smaller than the phosphor dots to provide positive tolerance, the illuminable phosphor areas on the screen would be much less than in a conventional tube. The '368 patent, however, recognizes that the positive tolerance system of ensuring accurate color reproduction is not necessary when each phosphor dot is surrounded by black material. The patent teaches that that material provides a built-in guardband which protects against slightly wandering electron beams. With that guardband, the beam landing areas can be *larger* than the phosphor dots. In fact, even though the dots in a '368 tube are smaller than the dots in a conventional tube, the beam landing area made possible by the black guardband can be used to maintain the brightness level of a conventional tube. (If the size of the phosphor dot in a '368 tube is reduced to the size of the beam landing area in a conventional tube, the size of the landing area in the '368 tube can be increased to the size of the phosphor dot in a conventional tube. The illuminated areas of the phosphors in both tubes are then the same.) When the clear glass viewing screen disclosed by the '368 patent is used, brightness exceeds that of a conventional tube. The system of electron beam landing areas larger than the phosphor dots is known today as "negative tolerance." [6]

The district court determined that the two most relevant prior art references were a patent issued to Frank J. Bingley in July, 1958,[7] and an article by Sam H. Kaplan [8] entitled "Theory of Parallax Barriers" published in the July, 1952 issue of the *Journal of the Society of Motion Picture and Television Engineers.* The Bingley patent is concerned primarily with index tubes rather than shadow mask tubes. In index tubes, the phosphors are deposited on the viewing screen in stripes. One electron gun sweeps the screen with a single beam that is unimpeded by a shadow mask; the beam bombards the phosphors of each color in turn.[9] The Bingley patent, however, also deals in part with shadow mask tubes. The patent discloses a shadow mask tube with spaced phosphor dots separated by black, light-absorbing material. Although Bingley says nothing about the relationship between beam landing areas and phosphor sizes in the context of a shadow mask tube, Bingley does say that in an index tube the scanning beam spot size may be larger than the width of the phosphor strip. Furthermore, Bingley discloses the use of a clear glass faceplate.

The Kaplan article teaches two alternative ways of avoiding overlap of electron beams onto the wrong phosphor dots in a shadow mask tube: either the size of the apertures in the shadow mask can be reduced, thereby reducing the size of the beam landing areas, or the size of the phosphor dots can be reduced, so that in the spaces where beam landing areas overlap the beams will not strike any phosphors. The first alternative results in the positive tolerance system employed in conventional shadow mask tubes. The second alternative results in a tube in which beam landing areas are larger than their corresponding spaced phosphor dots,[10] although it does not

---

6. We agree with the district court that the claims of the '368 patent cover the negative tolerance concept. *See* 404 F.Supp. at 557–58.

7. United States Letters Patent No. 2,842,697.

8. Kaplan is one of the co-inventors of the '368 patent.

9. Color selection in an index tube requires exact synchronization of the position and modulation of the electron beam. Because of the practical problems of achieving the required precision, index tubes have never been manufactured for commercial use.

10. The district judge offered two explanations for why Kaplan's second alternative was not practiced in the art. First, "it was not until many years later that commercially practicable techniques were developed for the production of tubes with phosphor dots smaller than the mask apertures . . . ." Second, "before the use of black, light-absorbing material between spaced phosphor dots was taught by Bingley, such a tube would have reflected room light back at the viewer like a mirror"; the aluminum layer ordinarily placed on top of the phosphors on the inside surface of the screen would have been revealed in the spaces between the dots. 404 F.Supp. at 561–62.

necessarily result in the negative tolerance tube of the '368 patent.[11]

The district court observed that the level of ordinary skill in the art of color television picture tube design was high, and determined that "a person having ordinary skill in the art" at the time the '368 patent was conceived, 35 U.S.C. § 103 (1970), would have been led inexorably from the spaced-phosphor-dot teaching of Bingley to the negative tolerance concept of the '368 patent. If the hypothetical skilled artisan following Bingley had reduced the size of the phosphor dots to accommodate light-absorbing material *and* employed the conventional positive tolerance concept, the court said, he

> would first have regretted the loss of brightness inherent in reducing the size of the landing areas to maintain the proper guardband within the now-reduced-in-size phosphor dots and then would quickly have perceived that there was no longer any need to maintain this particular relationship—that [accurate color reproduction] could be insured . . . so long as the guardband of the width customary in prior art tubes was preserved between the outer edge of each beam landing area and adjacent phosphor dots.

Having thus conceived of the screen ge-

ometry . . . of the '368 patent, the addition of clear glass to improve brightness would have been an obvious next step.

404 F.Supp. at 565–66 (footnote omitted).

Moreover, the court noted Bingley's teaching that when phosphors are spaced and surrounded by black material it becomes practical to have a beam landing area larger than the phosphor, as long as the landing area does not exceed the total size of the phosphor area and the black material on either side of it. The court found that it would have occurred to a person of ordinary skill in the art to apply this disclosure, made in the context of an index tube, to a shadow mask tube.[12] Finally, the district court considered Kaplan's second solution to the problem of color contamination in a shadow mask tube, that is, reducing the size of the phosphor dots without changing the size of the mask apertures. Kaplan's teaching of theoretical landing areas larger than the phosphor dots, the court found, "would have virtually compelled consideration of a comparable relationship between *effective* landing areas and the phosphor dots and of the utility of such a relationship in providing tolerance without loss of brightness." 404 F.Supp. at 567 (emphasis in original).[13] The court con-

11. Zenith contended at trial that following Kaplan's second alternative would result in a "zero tolerance" condition, because any movement of an electron beam landing area would cause the beam to impinge on another phosphor dot. *See* 404 F.Supp. at 562 & Figure 5. Toshiba responded that there was an inherent tolerance in Kaplan's second alternative, because it was well known that the "theoretical" beam landing area that Kaplan described—that area of the screen large enough to encompass the impact points of all electrons penetrating a particular aperture—exceeds the "effective" beam landing area—that area of the screen receiving a sufficient concentration of electrons to cause a particular phosphor to fluoresce. The district court agreed with Toshiba, but conceded that having theoretical landing areas larger than the phosphor dots does not *necessarily* involve effective landing areas larger than those dots. The particular dimensions of the tolerance, the court acknowledged, depend in any given tube on the details of its design. 404 F.Supp. at 562, 567.

12. In so finding, the court rejected Zenith's contention that Bingley's disclosure was not within the art to which a person of ordinary skill in the art would look for a solution to the problem that the patented device attempted to solve. The court stated that researchers in the shadow mask tube field were well aware of developments in the index tube field. Furthermore, the need to provide tolerance when choosing screen geometry is common to both kinds of tubes. "[T]here is nothing inherent in the manufacture of a shadow mask screen," said the court, "which would make Bingley's screen geometry suggestion for solving the tolerance problem in an index tube difficult of application in a shadow mask tube. To these facts must be added the fact . . . that Bingley's *express* suggestion for shadow mask tubes, if pursued with a beam size smaller than the reduced phosphors, would obviously result in a sacrifice of brightness." 404 F.Supp. at 567 (emphasis in original).

13. *See* note 11 *supra*.

cluded that the '368 patent was obvious in light of both the Bingley patent alone and the combination of Bingley with Kaplan.

## II.

■ We begin our analysis, as the district court began its, with the recognition that a patent is presumed to be valid, and that the burden of establishing invalidity rests on the party asserting it. 35 U.S.C. § 282 (1970). Furthermore, in this circuit invalidity must be demonstrated by clear and convincing proof. *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d 530, at 540 (3d Cir. 1976); *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 70 (3d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972).[14]

■ The ultimate determination of patent validity is a conclusion of law reviewable for error, but the resolution of the obviousness issue depends on several basic factual inquiries reviewable under the "clearly erroneous" standard of Fed.R. Civ.P. 52(a). *See Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 280, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); cases cited in *Flour City Architectural Metals v. Alpana Aluminum Products, Inc.*, 454 F.2d 98, 106 n.8 (8th Cir. 1972); *Philips Electronic & Pharmaceutical Industries Corp. v. Thermal & Electronics Industries, Inc.*, 450 F.2d 1164, 1172 (3d Cir. 1971). In *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court enumerated the factual inquiries that underlie the determination of obviousness. First, the scope and content of the prior art are to be discerned; second, the differences between the prior art and the claims at issue are to be ascertained; and third, the level of ordinary skill in the art must be resolved. In addition, the Court said, "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness, these inquiries may have relevancy." *Id.* at 17–18, 86 S.Ct. at 694. Counsel for Zenith stated at oral argument that the appellant does not challenge the district court's findings of fact,[15] but rather avers that that court's determination of obviousness resulted from the application of faulty principles of patent and evidence law. We undertake our consideration of the appellant's contentions mindful of the legal nature of all the issues raised, and cognizant of our obligation to make an independent judgment on the ultimate conclusion of obviousness.[16]

## III.

■ Zenith maintains that the district court's conclusion of obviousness was tainted by hindsight. The district judge reasoned backwards, the appellant insists, by

---

14. This standard is particularly applicable when it appears that the prior art invoked to invalidate a patent has been considered by the Patent Office. *See Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d at 540 n.28 (3d Cir. 1976); *Chicago Rawhide Mfg. Co. v. Crane Packing Co.*, 523 F.2d 452, 458 (7th Cir. 1975) (Stevens, J.), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976). In the instant case, neither the Bingley patent nor the Kaplan article was cited in the '368 file wrapper. The patent examiner did consider patents issued to Morrell (No. 2,795,719) and Evans *et al.* (No. 3,005,125) which the district court found, in combination, to be equivalent to the Bingley patent's primary teaching of spaced phosphor dots separated by black material. 404 F.Supp. at 566 n.26. Bingley's disclosure of beam landing areas larger than the phosphors, made in the context of an index tube, was not present in Morrell or Evans and was therefore not before the examiner. 404 F.Supp. at 566 & n.27.

15. Indeed, Zenith complimented Judge Stapleton in its brief for "an admirable job of analyzing the record and stating the facts accurately." Both parties adopted the district judge's recitation of the historical facts in their briefs.

16. We recognize nevertheless that because Judge Stapleton had a better opportunity to have the facts explained to him by expert witnesses and the arguments of counsel, his decision on the ultimate question of obviousness merits special respect. His opinion reveals a thorough comprehension of the alleged invention and the prior art. *See E–T Indus., Inc. v. Whittaker Corp.*, 523 F.2d 636, 641 (7th Cir. 1975) (Stevens, J.).

reading into the prior art the teachings of the '368 patent itself. Without knowledge of the improved picture reproduction made possible by the '368 patent and of what must be done to achieve that improvement, Zenith submits, the judge could not have determined that the '368 patent was obvious in light of both the Bingley patent alone and Bingley and the Kaplan article combined.

We perceive no such taint in the district court's careful execution of the factual analysis mandated by *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). The court evaluated the scope and content of the prior art as of the time that the '368 patent was conceived, and ascertained the differences between the prior art and the claims at issue from that same perspective. *See U.S. Expansion Bolt Co. v. Jordan Industries, Inc.,* 488 F.2d 566, 568 n.3 (3d Cir. 1973); 35 U.S.C. § 103 (1970). To be sure, the district court's conclusion that the '368 patent would have been obvious to a person having ordinary skill in the art[17] rested on the assumption that the hypothetical artisan was familiar with the Bingley patent and the Kaplan article, and on the factual finding that the level of ordinary skill in the art was high. That assumption was legally proper,[18] and that factual finding was fully supported by the record.

The district court recognized that any invention, when viewed with the assistance of hindsight, appears obvious in light of the prior art. 404 F.Supp. at 564 n.24. We believe that the district court avoided the temptation to use that assistance. We find its determination of obviousness to be based on a proper interpretation of the state of the prior art and on a correct application of

the standards established in *Graham v. John Deere Co.*

## IV.

Zenith contends that if the '368 concept of beam landing areas larger than phosphor dots was in fact obvious after Bingley, then that idea would have occurred to someone else. That no other researcher conceived the '368 invention between July 1958, when the Bingley patent was granted, and August 1964, when the patent in suit issued, even though a primary research goal in those years was to increase brightness and contrast, is, Zenith argues, conclusive evidence that the '368 concept was not obvious.

Zenith would have us treat the failure of others to conceive the patented tube design as a primary and preclusive determinant of nonobviousness. In *Graham v. John Deere Co.,* however, the Supreme Court characterized failure of others, commercial success, and long felt but unsolved needs as "secondary considerations" which "*might* be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness," said the Court, "these inquiries *may* have relevancy." 383 U.S. at 17–18, 86 S.Ct. 694 (emphasis added). We have previously stated that these secondary considerations are entitled to "only measured weight" in adjudging obviousness, *U.S. Expansion Bolt Co. v. Jordan Industries, Inc.,* 488 F.2d 566, 572 (3d Cir. 1973); *Frank W. Egan & Co. v. Modern Plastic Machinery Corp.,* 387 F.2d 319, 327 (3d Cir. 1967), *cert. denied,* 391 U.S. 966, 88 S.Ct. 2036, 20 L.Ed.2d 879 (1968), and that they cannot, by themselves, support a finding of nonobviousness if it is otherwise es-

---

17. Zenith does not contend in this court that the district court misdefined the pertinent art. *Cf. Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.,* 546 F.2d 530, at 537 (3d Cir. 1976).

18. The hypothetical person having ordinary skill in the art is "charged with knowledge of all that the prior art disclosed at the time of his alleged invention, irrespective of whether persons of ordinary skill in the field, or he himself,

or anyone else, actually possessed such all-encompassing familiarity with prior disclosures." *Cool-Fin Electronics Corp. v. International Electronic Research Corp.,* 491 F.2d 660, 662 n.7 (9th Cir. 1974), *quoting Walker v. General Motors Corp.,* 362 F.2d 56, 60 n.3 (9th Cir. 1966). *Accord, Layne-New York Co. v. Allied Asphalt Co.,* 501 F.2d 405, 406 (3d Cir. 1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

tablished that a patent's disclosures are obvious in light of the prior art. *Continental Can Co. v. Crown Cork & Seal Co.*, 415 F.2d 601, 602 (3d Cir. 1969), *cert. denied*, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970).[19]

In the instant case, the district judge took account of the secondary considerations mentioned in *Graham*. He noted the improved brightness and contrast that resulted when the negative tolerance concept was first practiced commercially in Zenith's Chromacolor tube, the industry recognition accorded the negative tolerance tube, and the commercial success of the '368 concept. 404 F.Supp. at 563–64. In addition, he acknowledged the failure of others, but asserted that that consideration could not bear the weight that Zenith sought to place on it.[20] The district judge concluded that the secondary evidence did not overcome the evidence of obviousness arising from the three primary factual inquiries: the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art.

Our own review of the record convinces us that the failure of others to discern the negative tolerance concept in the prior art is not preclusive evidence of nonobviousness. We conclude that the primary indicators of obviousness enumerated in *Graham* provide other, weightier evidence that the '368 patent would have been obvious to a person of ordinary skill in the art. *See Technograph Printed Circuits, Ltd. v. Martin-Marietta Corp.*, 474 F.2d 798, 808 (4th Cir.) *cert. denied*, 414 U.S. 880, 94 S.Ct. 68, 38 L.Ed.2d 125 (1973); *Reeves Brothers v. U. S. Laminating Corp.*, 417 F.2d 869, 872 (2d Cir. 1969).[21]

## V.

■ Finally, Zenith asserts that the district judge violated rudimentary principles of evidence law by basing his conclusion of obviousness on a series of unsupported inferences. In particular, the appellant points to the district court's assumption that the hypothetical artisan of ordinary skill applying Bingley's teachings to a shadow mask tube would "have regretted the loss of brightness inherent in reducing the size of the landing areas to maintain the proper guardbands within the now-reduced-in-size phosphor dots . . . ." 404 F.Supp. at 565. Why, Zenith asks, would he have regretted that loss of brightness when he had improved contrast by using light-absorbing material between the phosphor

---

**19.** *Cf. Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282–83, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976).

**20.** In response to Zenith's argument that a determination of obviousness could not stand when those in the art did not in fact see what was alleged to have been obvious to them, the district court stated, "Such an argument grows in persuasiveness as the time lengthens during which the prior art was in the public ken. Where, as here, the prior art (Bingley, issued July 8, 1958) was only available for eight months before the alleged invention was described in a writing, the argument loses its force." 404 F.Supp. at 567 (footnote omitted).

**21.** In *Potter Instrument Co. v. ODEC Computer Sys., Inc.*, 499 F.2d 209, 211 (1st Cir. 1974), the court affirmed a determination of obviousness notwithstanding evidence of the failure of others. The appellant stressed that the patent in suit solved a problem that was widespread in the printing industry; even though a solution had been sought for several years, the prior art had not suggested the patented solution to anyone else—including the developer of the device said to have made the patented object obvious.

The court observed that the weight to be accorded secondary evidence of obviousness was a question entrusted primarily to the district court, and went on to state that the evidence of obviousness was sufficient to make recourse to secondary considerations unnecessary.

Zenith's suggestion that the failure of others to conceive the patented tube design is conclusive proof of nonobviousness blurs the distinctions between the statutory requirements of novelty and nonobviousness. Were we to accept Zenith's reasoning, we would hold, in effect, that an invention that meets the novelty requirements of 35 U.S.C. § 102 (1970), *as amended*, (Supp. III 1973), necessarily meets the nonobviousness requirement of 35 U.S.C. § 103 (1970). We cannot conclude that § 103 adds nothing to § 102, and for this reason, too, we reject Zenith's argument. *See Westinghouse Elec. Corp. v. Titanium Metals Corp. of America*, 454 F.2d 515, 518 (9th Cir. 1971), *cert. denied*, 407 U.S. 911, 92 S.Ct. 2439, 32 L.Ed.2d 685 (1972); *Malsbury Mfg. Co. v. Ald, Inc.*, 447 F.2d 809, 813 (7th Cir. 1971) (Stevens, J., dissenting).

dots, and when he could recover the lost brightness by using a clear glass faceplate? Furthermore, Zenith argues, upon that first unwarranted assumption the district judge erected a second. He assumed that the hypothetical artisan, upon having "regretted" a loss in brightness, "then would quickly have perceived that there was no longer any need to maintain" the conventional positive tolerance design in which the phosphor dots were larger than the beam landing areas. *Id.* The record affirmatively shows this second assumption to be unfounded, Zenith insists, because no one else perceived the negative tolerance concept in the six years between the appearance of Bingley and the issuance of the '368 patent. Zenith concludes that this "piling of assumptions upon assumptions" violated the rule that when an ultimate fact is inferred from circumstantial facts which themselves rest on inferences, "the prior inferences must be established to the exclusion of any other reasonable theory." J. Wigmore, Evidence § 41, at 439 (3d ed. 1940), quoting *New York Life Insurance Co. v. McNeely*, 52 Ariz. 181, 79 P.2d 948, 955 (1938).

We reject Zenith's contention. The district court did not base inferences on inferences, but rather drew parallel inferences from the same set of facts.[22] *See Prudential Insurance Co. v. Glasgow*, 208 F.2d 908, 912 (2d Cir. 1953); Annot., 5 A.L.R.3d 100, 120–31 (1966). The real issue as we see it is not whether the district court based inferences upon inferences, but whether the district court's conclusion of obviousness was based upon remote or unfounded inferences. *See United States v. Eustace*, 423 F.2d 569, 571 (2d Cir. 1970); cf. *Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp.*, 325 F.2d 2, 22 (3d Cir. 1963).

Zenith's allegation that the district court's decision rested upon impermissible inferences assumes, incorrectly, that the failure of others is conclusive proof of nonobviousness,[23] and ignores the fact that the

court's decision was based on more than Bingley's spaced-phosphor-dot disclosure. The court also considered the Kaplan article and Bingley's teaching that in an index tube scanning beam spot size can be larger than the width of the phosphor strip. In view of the high level of skill in the art, Bingley's disclosure of spaced phosphor dots in a shadow mask tube and beam spot size larger than the phosphors in an index tube, and the Kaplan article, we conclude that the record fully supports the inference that the '368 patent would have been obvious to a person of ordinary skill in the art.

### VI.

Accordingly, the judgment of the district court will be affirmed.

---

**22.** By anatomizing the district court's reasoning, the appellant seems to offer the unacceptable proposition that perceiving a solution does not necessarily entail the recognition of a problem.

**23.** *See* Part IV *supra.*